**Gregorio IGARTUA DE LA ROSA, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. Civ.00–1421(JP).**

United States District Court, D. Puerto Rico.

July 19, 2000.

Gregorio Igartúa de la Rosa, Aguadilla, PR, for plaintiff.

Isabel Muñoz Acosta, Assistant United States Attorney, Hato Rey, PR, David S.

Mendel, U.S. Department of Justice, Civil Division, Washington, DC, for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

### I. INTRODUCTION

The present political status of Puerto Rico has enslaved the United States citizens residing in Puerto Rico by preventing them from voting in Presidential and Congressional elections and therefore it is abhorrent to the most sacred of the basic safeguards contained in the Bill of Rights of the Constitution of the United States—freedom.

### II. BACKGROUND

Plaintiffs in the instant action are comprised of two groups of United States citizens residing in Puerto Rico who seek from the Court a declaratory judgment allowing them to vote in the upcoming and subsequent Presidential elections. One group of Plaintiffs, comprised of individuals who have always resided in Puerto Rico, argues that they have a right to vote in Presidential elections because they are U.S. citizens and, as such, are vested with the inherent power to vote for those who represent them. The second group is comprised of former stateside residents who, while there, were eligible to vote in Presidential elections but became ineligible to do so upon taking up residence in Puerto Rico. Both groups argue that the United States Constitution and the International Covenant on Civil and Political Rights, a treaty to which the United States is a party, guarantee their right to vote in Presidential elections. The second group also calls into question the constitutionality of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA" or "the Act"), 42 U.S.C. §§ 1973ff – 1973ff–6, that allows United States citizens residing *outside* the United States to vote in federal elections as absentee voters in their last state of residence.[1] Under UOCAVA, Puerto Rico is considered to be within the United States. Therefore, those residing in Puerto Rico are not allowed to vote as absentee voters in federal elections under the Act.[2]

In this case, the United States has filed a Motion to Dismiss (**docket No. 5**), which Plaintiffs have opposed (docket No. 7), and to which the United States has replied.[3] In the instant opinion, the Court considers these motions.

### III. DISCUSSION

#### A. Development of Puerto Rico's Relationship with the United States

To fully understand the context within which this action is brought it is necessary to retrace the history of the relationship between the United States and Puerto Rico within the context of the unfulfilled promises of freedom made by the United

---

1. For purposes of clarity and convenience, the Court shall distinguish the Plaintiffs as "the First Group" and "the Second Group."

2. In 1991, Co–Plaintiff Gregorio Igartúa de la Rosa ("Igartúa") brought with several others a complaint seeking the same relief sought here. The District Court, by voice of Judge Raymond L. Acosta, dismissed the action. The First Circuit affirmed in a *per curiam* decision holding that, under Article II of the U.S. Constitution, U.S. citizens residing in Puerto Rico do not have a right to vote in Presidential elections. The Court further held that the failure of UOCAVA to guarantee citizens moving to Puerto Rico the right to vote in Presidential elections does not violate their constitutional rights. *See Igartua de la Rosa*

*v. United States*, 842 F.Supp. 607 (D.Puerto Rico), *aff'd*, 32 F.3d 8 (1st Cir.1994), *cert. denied*, 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995).

3. In view that the Court is considering the Defendant's tendered reply the Court is hereby **GRANTING** Defendant's Motion to File Reply Briefs (docket No. 10). Furthermore, the Court is also considering Plaintiffs' supplemental motions in opposition (docket Nos. 9 and 11). The Court also **GRANTS** Plaintiffs' motion to file sur-replies (docket No. 12) and Defendant's motion to file response to second urgent motion (docket No. 13). The Court considers these documents in the instant analysis.

States to the people of Puerto Rico. The relationship between Puerto Rico and the United States began on July 25, 1898, when American forces arrived in Guánica, Puerto Rico under the leadership of General Nelson Miles. General Miles proclaimed that the American forces came "bearing the banner of freedom" and would bring to the Puerto Ricans "the fostering arm of a nation of free people, whose greatest power is in justice and humanity to all those living within its fold." José A. Cabranes, *Citizenship and the American Empire* 19 (Yale Univ. Press 1979) (citing *Constitution Establishing Self-Government in the Island of Puerto Rico by Spain 1897, reprinted in,* Office of the Commonwealth of Puerto Rico, *Documents on the Constitutional History of Puerto Rico* 55 (1964)). The American promise was to "bestow upon [the Puerto Ricans] the immunities and blessings of the liberal institutions of our Government . . . [and] the advantages and blessings of enlightened civilization." *Id.* The "splendid little war," as the Spanish American War of 1898 was dubbed, resulted in the American acquisition of Puerto Rico, Guam, and the Philippines.[4] *See* Treaty of Paris, Dec. 30, 1898, 30 U.S.Stat. 1754. The freedoms and rights promised to the people of Puerto Rico would be dictated by Congress, pursuant to the Treaty of Paris. *See id.* at Art. IX, par. 2.

With the dawn of the Twentieth Century came the first Organic Act of Puerto Rico, commonly referred to as the Foraker Act, 31 Stat. 77 (codified as amended at 48 U.S.C. §§ 733, 736, 738–40, 744, 864). The Foraker Act ended two years of American Military governance and established a civil government in Puerto Rico. The Foraker Act, however, stopped short of granting U.S. citizenship to the residents of Puerto Rico. U.S. citizenship came to Puerto Rico seventeen years later with the passage of the Jones Act, 39 Stat. 951 (1917). The granting of U.S. citizenship under the Jones Act, however, did not guarantee the new U.S. citizens residing in Puerto Rico the full range of rights that their counterparts residing in the mainland enjoyed. The Supreme Court made this pronouncement in *Balzac v. People of Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922), ruling that the rights that accompany American citizenship are a function of the political status of the venue in question.

The *Balzac* Court found support for this proposition in a group of cases collectively known as the Insular Cases, which defined Puerto Rico's political status as an "unincorporated territory" of the United States. *See Huus v. New York & P.R. Steamship Co.,* 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901); *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Armstrong v. United States,* 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Dooley v. United States,* 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Goetze v. United States,* 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901); *De Lima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901). This novel term referred more specifically to the extent to which the United States Constitution applied to Puerto Rico. According to Justice Brown in *Downes,* the extent to which the Constitution applied to Puerto Rico depended "in the nature of the government created by that instrument, in the opinion of its contemporaries, in the practical construction put upon it by Congress and in the deci-

4. The plans the United States government had for the Philippines were different than those the Government had in store for Puerto Rico. The Senate adopted a resolution stating that it was "not intended to incorporate the inhabitants of the Philippine Islands into citizenship of the United States." The United States sought to prepare the Philippines for "local self-government, and in due time to make such disposition of said islands as will best promote the interests of the citizens of the United States and the inhabitants of said islands." S.J.Res. No. 240, 55th Cong., 3d Sess., 32 Cong.Rec. 1846 (1899). Race, geographic distance and economic factors distinguished the roads paved for Puerto Rico and the Philippines in their relationship with the United States. *See Cabranes, supra* at 30.

sion of this Court." *Downes,* 182 U.S. at 249, 21 S.Ct. 770. Justice Brown further stated that, "the Island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States." *Id.* at 287, 21 S.Ct. 770. In explaining the relationship, the Court, in this 1901 case, observed that the power of the United States to acquire territories, such as Puerto Rico, "implies not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants and what status shall be in what Chief Justice Marshall termed the 'American Empire.' " *Id.* at 279, 21 S.Ct. 770. The holdings of the Insular Cases and *Balzac,* however, stand at odds with the legislative intent driving the Jones Act, as it was believed that "the granting of citizenship to Puerto Ricans would entitle them to all the rights and privileges of such a status." *See* Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal* 89 (Universidad de Puerto Rico ed., 1985).

The next development in the relationship between Puerto Rico and the United States was the enactment of the U.S. Nationality Act of 1940, which made all persons born in Puerto Rico on or after January 13, 1941, and subject to the jurisdiction of the United States, citizens of the United States at birth. *See* 8 U.S.C. § 1402. Subsequently, Congress passed Law 600, Pub.L. No. 81–600, 64 Stat. 319 (1950). *See id.* at 133. Law 600 repealed those portions of the Jones Act dealing with the structure and organization of the Island's government and allowed the people of Puerto Rico to draft their own constitution. Although Law 600 may have provided for the ratification of a local constitution, it has been decided that Puerto Rico remained and remains an unincorporated territory of the United States under the territorial clause of the Constitution. *See Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). The fact that Puerto Rico is dubbed a Commonwealth is irrelevant as, "the commonwealth of Puer-

to Rico is a 'territory' within the constitutional provision empowering Congress to dispose of and make all needful rules and regulations respecting the territory or other people belonging to the United States." *Americana of Puerto Rico, Inc. v. Kaplus,* 368 F.2d 431 (3d Cir.1966); *see also Dávila-Pérez v. Lockheed Martin Corp.,* 202 F.3d 464, 468 (1st Cir.2000) (stating that Puerto Rico "is still subject to the plenary powers of Congress under the territorial clause"). Under the territorial clause, Congress has the "Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Thus, Congress may limit the freedoms which U.S. citizens residing in Puerto Rico may enjoy. In *Downes,* however, the Supreme Court concluded that constitutional provisions pertaining to "those fundamental limitations in favor of personal rights which were formulated in the Constitution and in its amendments" would automatically apply to any territory. *Downes,* 182 U.S. at 269, 21 S.Ct. 770. In this way, fundamental rights extend to Puerto Rico.

The present political status of Puerto Rico represents a deviation from the original road upon which the Island embarked vis-à-vis its relationship with the United States. At the turn of the Twentieth Century, it became "evident that both of the political parties of the country were now in substantial agreement that Puerto Rico would become a part of the Union." Cabranes, *supra* at 31 (citing Cong.Rec.2000–01 (1900) (remarks of Rep. Newlands)). In 1899, Senator Foraker introduced a bill to grant American citizenship to Puerto Rico residents. Furthermore, Representative Sereno Payne from New York introduced a bill to establish free trade between Puerto Rico and the United States. *See* Torruella, *supra* at 32–33 (citing Simeon E. Baldwin, *The Constitutional Questions Incident to the Acquisition and Government by the United States of Island Territory,* 12 Harv.L.Rev. 393 (1899); Carman

L. Randolph, *Constitutional Aspects of Annexation,* 12 Harv.L.Rev. 291 (1898)). The feeling in Congress at the time was expressed by Representative George B. McClellan, who stated,

> Puerto Rico belongs to us, and it is a problem that must be solved now. It is a part of the United States; the Constitution extends over it; its territory is our territory; its citizens are our citizens. . . . I believe that we can only hold territory, as a nation, in trust for the States that are ultimately to be erected out of that territory.

Cabranes, *supra* at 33 (citing 33 Cong 2067 (1900) (remarks of Rep. McClellan)). The consensus resulted in part from the willingness of the people of Puerto Rico to welcome the United States to its shores. Representative Jacob H. Bromwell from Ohio stated,

> Puerto Rico came to us voluntarily and without bloodshed. She welcomed us with open arms. . . . Her people welcomed the armies under Miles as deliverers and benefactors. They professed themselves ready to become peaceable and loyal citizens of this country. . . . If any people on earth deserve fair and considerate treatment at our hands it is the people of Puerto Rico.

*Id.* at 32 (citing 33 Cong.Rec.2043 (remarks of Rep. Bromwell)).

The concept of citizenship and statehood as going hand-in-hand was also conveyed by the Puerto Ricans who appeared before Congress. As Luis Muñoz Rivera stated before the House Committee of Insular Affairs:

> The sentiments of the Porto Rican people could be condensed into declaring to this committee: "If you wish to make us citizens of an inferior class, our country not being allowed to become a State of the Union, or to become an independent State, because the American citizenship would be incompatible with any other national citizenship; if we can not be one of your States; if we can not constitute a country of our own, then we will have to

be perpetually a colony, a dependency of the United States. Is that the kind of citizenship you offer us? Then, that is the citizenship we refuse."

*Id.* at 76 (citing Hearings on H.R.13818 before the House Comm. of Insular Affairs, 63d Cong., 2d Sess. 5 (1914) (statement of Resident Commissioner Luis Muñoz Rivera)). Former Puerto Rico Resident Commissioner Federico Degetau said, "we simply want the Constitution of the United States applied to the Island, first as a Territory, then as a State." Neftalí Fuster, Commentary, *Puerto Rico Should Remember Degetau,* The San Juan Star, Dec. 7, 1999, at 33 (citing Degetau's statements published in The Washington Post in its December 25, 1900 issue). Degetau's statements resulted from his view that Puerto Ricans were "legally Americans." Hearings on H.R.14083 Before the House Comm. on Insular Affairs, 57th Cong., 1st Sess. 36 (1902). Thus, there can be no doubt that the acceptance of U.S. citizenship was understood as a first step towards statehood.

## B. Constitutional Right to Vote in Presidential Elections

The crux of the case at bar is whether the inability of United States citizens residing in Puerto Rico to vote in Presidential elections is unconstitutional. Plaintiffs' claim hinges on their *inability* to vote in Presidential elections. But what, if anything, creates that inability? Article II of the U.S. Constitution states that the President is elected by each State "in such manner as the Legislature thereof may direct." U.S. Const. art. II, § 1, cl. 2. The First and Ninth Circuits held that the U.S. citizens residing in Puerto Rico and Guam, respectively, could not vote for the President under this constitutional clause because its use of the term "State" does not extend to territories. *See Igartúa De La Rosa v. United States,* 32 F.3d 8, 10 (1st Cir.1994) ("Igartúa I"); *Attorney General of Territory of Guam on behalf of All U.S.*

*Citizens Residing in Guam v. United States,* 738 F.2d 1017, 1019 (9th Cir.1984), *cert. denied,* 469 U.S. 1209, 105 S.Ct. 1174, 84 L.Ed.2d 323 (1985). The First and Ninth Circuits' strict reading of Article II of the Constitution was partially grounded on the Twenty–Third Amendment to the Constitution that recognizes the right of the residents of the District of Columbia to vote in Presidential elections. If, as residents of a non-State, District of Columbia residents could not vote in Presidential elections under Article II, neither could the residents of the territories.

The process by which the President and Vice President are elected is indirect as eligible voters cast their ballots for delegates to the electoral college, who in turn, elect the President and Vice President. Therefore, while *Iqartúa I* centered on Plaintiffs' inability to vote for the President and Vice President, the instant case revolves around their inability to elect delegates to the electoral college. Furthermore, Article II, section 1, clause 2 of the United States Constitution speaks to the way in which residents of the *states* participate in Presidential elections. Accordingly, because Puerto Rico is an unincorporated territory of the Union, its residents would not participate in Presidential elections pursuant to that constitutional clause. Thus, Defendant is correct in stating that this clause is not of territorial applicability. Rather, the clause refers to the logistics by which the electors of the states elect the President and the Vice President.

In the case at bar, however, the Court considers whether Plaintiffs have a fundamental right under the United States Constitution to participate in Presidential elections. Article II, section 1, clause 2, does not preclude the United States citizens in Puerto Rico from voting in Presidential elections. The right to vote is a function of citizenship and a fundamental right preservative of all other rights. *See Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Article II merely sets forth the mechanism by which the right to vote will be implemented in the states.

The history of the United States is largely characterized by the enfranchisement of segments within its citizenry. The Constitution has been amended to entrench the fundamental right to vote. The Fifteenth Amendment guaranteed former slaves the right to vote. The Nineteenth Amendment enfranchised women, as did the Twenty–Sixth Amendment with citizens who have reached the age of eighteen. The Twenty–Third Amendment created the means by which the residents of the District of Columbia would vote in Presidential elections. The Twenty–Fourth Amendment eliminated the poll tax as an obstacle to the ballot box. Yet, somehow the arguments that have justified these amendments have not carried over to Puerto Rico.

Nevertheless, the underlying arguments supporting the ratification of the Twenty–Third Amendment to the Constitution which recognizes the right to vote in Presidential elections to residents of the District of Columbia apply to recognizing this right to United States citizens residing in Puerto Rico. *See* H.R.Rep No. 86–1698, 86th Cong., 2d Sess. 2 (1960), *reprinted in* 1960 U.S.C.C.A.N. 1459, 1460. Like United States citizens residing in the District of Columbia and the fifty states, those residing in Puerto Rico have fulfilled the highest calling of citizenship, fighting and dying in the battlefields in two world wars, the Korean, Vietnam and Gulf wars. Still, despite paying for their citizenship with blood, U.S. citizens residing in Puerto Rico have not entered the Presidential ballot box. It is inconceivable to our constitutional order to expect that the government can place our nation's sons and daughters in harm's way and not recognize the power of those individuals to have a say in electing those who will make that decision. It is no less preposterous that the United States can fight for the freedom of others abroad and ignore the lack of liberty of citizens at home.

Despite that the arguments supporting the enfranchisement of large segments of Americans carry over to the enfranchisement of residents of Puerto Rico, objections have been raised along the way. An apparent objection to enfranchising United States citizens residing in Puerto Rico emanates from the dilution of the vote of other states in the electoral college. The Court finds, however, that this is a consideration that has always been present any time a state comes into the Union and therefore, should not play a role in excluding these citizens. Furthermore, Puerto Rico has been living within the American system longer than many territories before they became states and therefore its residents should not be treated as newcomers to the nation.

Other objections have historically been raised to stand in freedom's way. Among them are the differences between the United States and Puerto Rico as to language and culture. It is this concept of cultural incompatibility that fueled the enactment of the Chinese Exclusion Act which barred Chinese immigration and their admission to American citizenship. Fortunately, many of these cultural barriers have been dismantled, partially as a result of the national embrace of an American identity comprised of a multiplicity of cultures, peoples, and heritages.

The United States has been well acquainted with the subject of language differences since the arrival of the Pilgrims who intermingled with the Native Americans and even with the turkeys. Spanish and English are the official languages of Puerto Rico. Both were spoken in all the battlefields where U.S. citizens residing in Puerto Rico fought in the defense of freedom. Nobody in the battlefield asked these citizens whether they wanted to die in English or in Spanish. Rather, they fought and perished singing the Star Spangled Banner which is sung today as the National Anthem throughout Puerto Rico. Faced with such fundamental considerations of freedom, language is not a de-

ciding subject even considering that the prevailing language in London was Latin during Roman times. Anyhow, in what language is the judge writing this opinion?

The Supreme Court has been consistent in acknowledging the universality of voting as a fundamental right in a democratic society. In challenging proposed legislative reapportionment plans in Alabama, the Supreme Court in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), stated that all qualified citizens have a right to vote which is protected by the Constitution. "The right to vote freely for the candidate of one's choice is the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the exercise of the franchise." *Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362. In this way, the Supreme Court has interpreted the right to vote as being so fundamental that even limitations on the franchise, which stop short of outright denial of the right to vote, can undermine the constitutional order.

The importance of protecting the right to vote emanates from the bilateral nature of a representative government. The United States citizens residing in Puerto Rico are subject to the laws of the United States and therefore have a vested interest in participating in Presidential elections. In *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the Supreme Court declared unconstitutional a New York state law which provided that only residents who own or lease taxable real property within a district could vote in that school district's elections. The Court was not compelled by the State's argument that only those who own property have a vested interest in the election. Rather, the essence of freedom is for individuals to vote for those who represent them. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 819, 115

S.Ct. 1842, 131 L.Ed.2d 881 (1995). This bilateral interaction is in the nature of a contract whereby officials acquire from the citizenry a mandate to govern derivative of the right to vote.

In this way, the right to govern is what the citizenry gives the government in consideration of the right to vote. Failure to establish such meeting of the minds voids the contract established by the parties and calls into question the legitimacy of the relationship. As stated by Columbia Law Professor Gerald Neuman:

> For the Federal Government to acquire total governing power over new territories ... without consent of the local population and without according them ... the rights reserved under the Constitution raises starkly the question of how the exercise of such governing power can be legitimized. The insular cases did meet the naturalist tradition ... by recognizing and making judicially enforceable certain "fundamental" guarantees, seemingly the minimum core of natural rights. But, as ... Harlan ... protested, this constitutionalism is not our constitutionalism.

Gerald L. Neuman, *Whose Constitution?*, 100 Yale L.J. 909, 978 (1991). The electoral ostracism of fellow United States citizens residing in Puerto Rico is abhorrent to our constitutionalism and to the precepts of democracy.

Although the United States gives the residents of Puerto Rico billions of dollars in aid each year, it is implausible to argue that receiving such aid results in the waiving of the constitutional right to freedoms materialized by the right to vote. Nor does it hold water to state that such trade-off is economically worthwhile. Freedom is priceless and cannot be bought at the expense of a slap in the face with a $5.00 bill. Freedom enables individuals to create wealth. "If there is no political freedom, there can be no economic freedom where individuals can develop their innate abilities. That is why the United States' main claim to glory is not predicated upon

the powerhouse of Wall Street but the Bill of Rights that protected the rights of citizens in a free society which created a society of equals devoid of the caste system and made possible a Wall Street and the American Dream." Zappa v. Cruz, 30 F.Supp.2d 123, 140 (D.Puerto Rico 1998) (Pieras, J.). This concept of freedom is synonymous with our Constitution. That is why it is sad that the United States citizens residing in Puerto Rico, who sit in the farthest frontier of the United States in the Atlantic and who have been U.S. citizens in good standing for close to 100 years, have embraced and made theirs a political culture similar to that of the United States and different from the political culture of other Latin American countries, and yet have not enjoyed the rights that go hand-in-hand with their political culture. *See id.* at 137.

It is the American Dream, the dream of democracy grounded in freedom, that all citizens of this country strive to obtain. The United States Constitution forever changed the history of humanity when it did away with human bondage. It did away with slavery and, in doing so, vindicated the principle that all men are created equal. The inability to vote represents a form of slavery as it subordinates the will of the people. History teaches us the lessons of the plight for freedom. The darkest days of our nation involved this struggle as a civil war was fought to end slavery. Subsequently, slavery remained beneath the national surface as Jim Crow and segregation prolonged subordination. The battle for freedom was finally won, not in bloody battlefields of Appomattox, but in the hallowed halls of the Supreme Court with the end of segregation in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

Reflecting on the meaning of the Constitution, Justice Marshall stated:

> No doubt it will be said, when the unpleasant truth of the history of slavery in America is mentioned during this bicentennial year, that the Constitution

was a product of its times, and embodied a compromise which, under other circumstances would not have been made.... The original intent of the phrase, 'We the People,' was far too clear for any ameliorating construction.... Thus, in this bicentennial year, we may not participate in the festivities with flag-waving fervor.... I plan to celebrate the bicentennial of the Constitution as a living document, including the Bill of Rights and the other amendments protecting individual freedoms and human rights.

Thurgood Marshall, *Reflections on the Bicentennial of the United States Constitution*, 101 Harv.L.Rev. 1, 3, 4, 5 (1987). The Court finds that the evolution of constitutional thought can only lead to the inevitable conclusion that United States citizens residing in Puerto Rico have always had the right to enter the ballot box. Ultimately,

[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our constitution leaves no room for classification of people in a way that unnecessarily abridges that right.

*Wesberry v. Sanders*, 376 U.S. 1, 17–18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (Black, J.). The right to vote is protected because it ensures that citizens, without classification, have a say in electing those who represent them and thereby in the laws which control their lives. Thus, it is inconsistent with that principle to keep U.S. citizens residing in Puerto Rico from the ballot box.

It is precisely for the reasons stated above that a constitutional amendment is not needed to grant the United States citizens residing in Puerto Rico the right to participate in Presidential elections. The right preexists the potential amendment by virtue that the Constitution itself provides that right. Requiring a constitutional amendment to grant U.S. citizens residing in Puerto Rico the right to participate in Presidential elections is tantamount to entering into a democratic process to determine if democracy should prevail. In this way, a constitutional amendment, like Article II, section 1, clause 2, might address the way in which U.S. citizens residing in Puerto Rico would vote in such elections. Just as UOCAVA allowed, without the need of a constitutional amendment, the participation in federal elections of U.S. citizens residing abroad, U.S. citizens residing in Puerto Rico do not need a constitutional amendment to be able to vote in Presidential elections.

What has stood in the way of the U.S. citizens living in Puerto Rico from reaching the ballot box, however, is the incompatibility of Puerto Rico's status with the Constitution. The present political status is politically abnormal because there is still confusion with regards to the rights and freedoms that as U.S. citizens, Puerto Rico residents can enjoy. There is no better example than this case. Under the present status, the residents of Puerto Rico enjoy some benefits and responsibilities but are deprived of others. Ultimately, it is this political conundrum that has characterized the present status of Puerto Rico: a status of subordination through disenfranchisement. It is a status, which despite providing for citizenship, denies the right to have a voting Congressional delegation. It is a status that stands at odds with the words of Lincoln that "[n]o man is good enough to govern another without the other's consent." Abraham Lincoln, Speech, Peoria, Illinois (October 16, 1854), *reprinted in* John Bartlett, *Familiar Quotations* 635b (14th ed.1968). It stands in starker contrast with the proposition that slavery is so abhorrent that not even those held in subordination can consent to it. The inability to vote is the inability to consent to governance. In this manner, the present status is un-American and the

citizenship which U.S. citizens residing in Puerto Rico hold dear is illusory.

It is precisely because of the inchoate and colonial nature of the present status that Puerto Rico's political relationship with the United States must evolve into one of political dignity, which does not infringe upon the freedom of the United States citizens residing in Puerto Rico. Any status formula that hinders freedom insofar as it does not guarantee the participation of U.S. citizens residing in Puerto Rico in Congressional and Presidential elections is unconstitutional and unconscionable and cannot be included as one of the options because slavery, even if voluntary, is repugnant to the concept of freedom which is the essence of the U.S. Constitution.

Freedom is the cornerstone of America's foundation. The colonial revolutionaries sacrificed life and limb for the sake of freedom. No one said it more eloquently than Patrick Henry when he stated,

> Why stand we here idle? What is it that gentlemen wish? What would they have? Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take, but as for me: Give me liberty, or give me death!

Patrick Henry, Liberty or Death, Richmond, Va., (Mar. 23, 1775), *reprinted in* Gregory R. Suriano, *Great American Speeches* 4 (1993).

Now more than ever, the freedom of the individual upon which this government was anchored as its reason to be is revered. The world has joined in recognizing it as the moving force of nations. Without freedom of the individuals within a community, the people who live in that soil have no claim for nationhood. Where there is no freedom of the individuals there is no nation of any kind.

The United States citizens residing in Puerto Rico are proud to have formed part of this successful world experiment and together with their other fellow citizens throughout the United States want to continue to work towards and to fight for the preservation of that personal freedom within the United States and throughout the world. Among the rights that are an integral part of the concept of freedom is the right to vote. In a democratic society like ours freedom is impossible without access to the ballot box. The United States citizens residing in Puerto Rico have not had that access and they have a constitutional right to that access. In this land of the free let us make sure that freedom prevails.

## C. Right to Vote Under International Law

Plaintiffs also contend that they have an actionable claim to vote in Presidential elections under the International Covenant on Civil and Political Rights, 6 I.L.M. 368 (1967). The First Circuit in *Igartua I* noted that the treaty in question states in no uncertain terms that Articles 1 through 27 are not self-executing and, therefore, violating its provisions does not give rise to privately enforceable rights under United States law. *See Igartua I,* 32 F.3d at 10, n. 10 (citing *United States v. Green,* 671 F.2d 46, 50 (1st Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *United States v. Thompson,* 928 F.2d 1060, 1066 (11th Cir.), *cert. denied,* 502 U.S. 897, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991)). In view of the above, Plaintiffs lack an actionable claim under the treaty.

## D. Constitutionality of UOCAVA

The Second Group calls into question the constitutionality of UOCAVA under the Due Process and Equal Protection clauses of the Constitution. Under UOCAVA, United States citizens residing abroad may vote in federal elections by absentee ballot in their last place of residence in the United States, so long as they are otherwise qualified to vote under the laws of the jurisdiction where they last

resided. *See* 42 U.S.C. § 1973ff–1. UOCAVA, however, does not apply to U.S. citizens who move from one jurisdiction to another within the United States. *See* 42 U.S.C. § 1973ff–6(5). In other words, a citizen who moves from New York to Puerto Rico does not retain the right to vote in New York in federal elections because Puerto Rico, like New York, is another jurisdiction within the United States. According to the Plaintiffs, UOCAVA discriminates against U.S. citizens who move and take up residence in Puerto Rico rather than outside the United States, as they are not entitled by the Act to vote in their prior state of residence.

In *Igartua I*, the First Circuit noted that UOCAVA does not distinguish between those who reside overseas and those who take up residence in Puerto Rico, but rather distinguishes between those who reside overseas and those who move anywhere within the United States. The Court found that because such a distinction neither affects a suspect class nor infringes upon a fundamental right, the Act only needs to have a rational basis to pass constitutional muster. *See Igartua I*, 32 F.3d at 10–11. In concluding that the statute was constitutional, the Circuit reasoned that rather than discriminating against those who take up residence in Puerto Rico, the statute sought to protect those who move outside the United States. *See id.* "Without the Act, voters who move overseas could lose their right to vote in all federal elections. However, voters who move to a new residence within the United States are eligible to vote in a federal election in their new place of residence." *Id.* The First Circuit further noted that, despite affecting the right to vote, UOCAVA does not infringe that right, but rather limits a State's ability to restrict it. *See id.* at 10, n. 2. Although the Act does not require a State to allow its ex-residents, now residing in Puerto Rico, to vote in federal elections, nothing stops a State from allowing these residents to do so. In other words, the fact that UOCAVA does not provide for U.S. citizens residing in Puerto Rico to vote in federal elections, does not prevent the states from allowing these citizens and ex-residents from doing so through their own statutes. In view of this interpretation, Plaintiffs lack a cause of action under UOCAVA.

## IV. CONCLUSION

In view that the Court finds that Plaintiffs have the right to participate in the upcoming Presidential elections, the Court hereby **DENIES** Defendant's Motion to Dismiss.

**IT IS SO ORDERED.**