# United States Court of Appeals
## For the First Circuit

_____

No. 00-2083


GREGORIO IGARTUA DE LA ROSA, ET AL.,

Plaintiffs, Appellees,


v.

UNITED STATES OF AMERICA,

Defendant, Appellant.


_____


COMMONWEALTH OF PUERTO RICO,

Intervenor.

_____


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., <u>Senior U.S. District Judge</u>]


_____


Before

Torruella, <u>Chief Judge</u>,
Lynch and Lipez, <u>Circuit Judges</u>.


_____


<u>Matthew M. Collette</u>, Attorney, U.S. Department of Justice, with
whom <u>Jacob M. Lewis</u>, Attorney, U.S. Department of Justice, <u>David W.</u>

Ogden, Assistant Attorney General, and Guillermo Gil, U.S. Attorney, were on brief, for appellant.

Gregorio Igartua for appellee.

Angel E. Rotger Sabat, Attorney General, Commonwealth of Puerto Rico and Gustavo A. Gelpi, Solicitor General, Commonwealth of Puerto Rico, with whom John F. Nevares, Carlos Lugo-Fiol, and Smith and Nevares, were on brief, for intervenor-appellee Commonwealth of Puerto Rico.

Charles J. Cooper, Michael A. Carvin, Jeffrey A. Tomasevich, and Cooper, Carvin & Rosenthal on brief for amicus curiae Popular Democratic Party of Puerto Rico.

_____

October 13, 2000

_____

**Per Curiam**.  On April 5, 2000 a complaint was filed in the United States District Court for the District of Puerto Rico by eleven individuals alleging that as citizens of the United States residing in Puerto Rico they are being deprived of the right to vote for the candidates to the offices of President and Vice-President of the United States, a condition which they view to be a "violation of their constitutional rights to the same privileges and immunities, treaty rights, due process and equal protection of the laws" enjoyed by United States citizens residing in the States.

Plaintiffs, in effect, comprise two separate groups.  The first includes individuals who have always resided in Puerto Rico and whose claim is based on their alleged right to vote for the national offices in question because they consider it a right inherent in United States citizenship.  The second group is comprised of former residents of states who were eligible to vote during such residence in the States but became ineligible to do so upon taking residency in Puerto Rico. Both groups claim entitlement to vote pursuant to the Constitution of the United States and pursuant to treaty obligations assumed by the United States under the International Covenant on Civil and Political Rights, U.N.T.S. No. 14668, Vol. 999 (1976) p. 171, ratified, 138 Cong. Rec. S-4781 (April 2, 1992) ("ICCPR").  In addition, the second group also calls into question the constitutionality of the Uniformed and Overseas Citizens Absentee Voting Act (NOCAVA), 42 U.S.C. §§ 1973ff-1973ff-6, which allows United States citizens residing outside the United States to vote in federal elections as absentee voters in their last state of residence.  Because Puerto Rico is included within the

-3-

definition of "United States," 42 U.S.C. § 1973ff-6(8), residents of Puerto Rico who would otherwise qualify to vote pursuant to this statute are disqualified.  This is claimed to be a violation of various constitutional provisions.

Plaintiffs sought a declaratory judgment against the United States affirming the invalidity of the denial of their alleged right to vote for the national offices in question.  In addition, they sought an order requiring the United States "to take all the necessary steps" to implement their alleged right to vote for President and Vice-President.

On June 5, 2000 the United States moved to dismiss the complaint claiming, in substance, that the allegations contained in the complaint "are virtually identical to those previously brought by eleven individuals, including [Plaintiff] Igartua in the case of Igartua de la Rosa, et al. v. United States, C. 91-2506," in which the District Court (Acosta, J.) dismissed plaintiffs' request for declaratory and injunctive relief for failure to state a claim upon which relief could be granted.  See Igartua v. United States, 842 F. Supp. 607 (D. P.R. 1994), aff'd, 32 F.3d 8, 9 (1st Cir. 1994), (Igartua I), cert. denied, 514 U.S. 1049 (1995).  The United States alleged that Igartua I required dismissal of the present action under the principles of res judicata and stare decisis.

This motion was denied by the District Court on July 19, 2000 in an extensive opinion, see Igartua v. United States, 107 F. Supp. 2d 140 (D. P.R. 2000) ( Igartua II), in which it ruled that the provisions of the ICCPR were not self-executing and thus did not give rise to privately enforceable rights under United States law, and further that

-4-

NOCAVA did not violate Plaintiffs' constitutional rights. It ruled, however, that preventing plaintiffs from voting in presidential and vice-presidential elections was unconstitutional.

Thereafter, on July 27, 2000 the Commonwealth of Puerto Rico and its governor, Pedro Rosselló, moved to intervene in this action, in effect supporting the claims of Plaintiffs. This intervention was allowed by the district court on July 28, 2000.

On August 1, 2000 the United States filed its Answer, alleging in defense substantially the same grounds as claimed in its Motion to Dismiss, and in addition contending that the issues presented by plaintiffs raised "political questions outside the jurisdiction of the federal courts."

After several intervening procedural events, on August 29, 2000 the district court entered a Final Opinion and Order, essentially confirming its July 29 opinion, and entering a Final Judgment: (1) Declaring "that the United States Citizens residing in Puerto Rico have the right to vote in Presidential elections and that its electoral votes must be counted in Congress"; (2) Concluding "that the Government of Puerto Rico has the obligation to organize the means by which the United States citizens residing in Puerto Rico will vote in the upcoming and subsequent Presidential elections and to provide for the appointment of Presidential electors," and ordering "the Government of Puerto Rico to act with all possible expediency to create such mechanism;" and (3) Ordering "the Government of Puerto Rico to inform the Court of all developments related to its implementation of the Presidential vote

-5-

until the votes are counted pursuant to the Twelfth Amendment to the Constitution."

On September 10, 2000 the Legislature of Puerto Rico enacted Law No. 403 for the purpose of allowing the citizens of the United States of America domiciled in Puerto Rico to vote in the election for the offices of President and Vice-President of the United States, and to establish the procedures and mechanisms to effectuate said vote. This bill was signed into law on September 10, 2000 and became effective immediately. See Law No. 403 of September 10, 2000, § 4.6.

On September 11, 2000 the United States filed its Notice of Appeal from this Final Judgment and from the Final Opinion and Order also entered by the district court on August 29, 2000, which contained provisions substantially the same as those in the Final Judgment. Neither the Plaintiffs nor the Intervenor Government of Puerto Rico and Governor appealed.

For the reasons stated herein, we reverse and vacate the Final Judgment and Final Opinion and Order and remand with instructions to dismiss the action. See Toren v. Toren, 191 F.3d 23 (1st Cir. 1999). This court, of course, expresses no opinion with regard to the validity under Puerto Rican law of Law No. 403.

**I**

In Igartua I, a case brought by the same lead plaintiff and lawyer who appears currently before us, this court held with undeniable clarity that the Constitution of the United States does not confer upon United States citizens residing in Puerto Rico a right to participate in the national election for President and Vice-President. Addressing

-6-

precisely the argument presented to the district court in this case, this court recognized that Article II of the Constitution explicitly provides that the President of the United States shall be elected by electors who are chosen by the States, in such manner as each state's legislature may direct. See id. at 9 (citing U.S. Const. Art. II, § 1, cl. 2). We concluded that Puerto Rico, which is not a State, may not designate electors to the electoral college, and therefore that the residents of Puerto Rico have no constitutional right to participate in the national election of the President and Vice-President. See id. at 9-10.

Since our decision in Igartua I in 1994, Puerto Rico has not become a State, nor has the United States amended the Constitution to allow United States citizens residing in Puerto Rico to vote for President, as it did for United States citizens residing in the District of Columbia with the Twenty-Third Amendment to the Constitution. See id. at 10. Absent such a change in the status of Puerto Rico or an amendment to the Constitution of the United States, our decision in Igartua I controls this case, unless there has been intervening controlling or compelling authority. See Gately v. Massachusetts, 2 F.3d 1221, 1226 (1st Cir. 1993) ("The doctrine of stare decisis renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision.");[1] see also Williams v. Ashland Eng'g Co., 45 F.3d 588, 592

---

[1]    The Commonwealth argues that stare decisis is not "an inexorable command," particularly in constitutional cases. But Igartua I is based on Supreme Court opinions which that court has not reconsidered and we are not free to do so. And "[e]ven in

(1st Cir. 1995) ("In a multi-panel circuit, newly constituted panels are, for the most part, bound by prior panel decisions closely on point.").

## II

The district court attempted to distinguish Igartua I in its July 19 opinion (but not in its Final Opinion and Order) on reasoning that "while Igartua I centered on Plaintiff's inability to vote for the President and Vice President, the instant case revolves around their inability to elect delegates to the electoral college." Igartua II, 107 F. Supp.2d at 145. This effort at distinguishing Igartua I obviously fails. Under the Constitution, the appointment of electors (through the popular vote) is the means by which the President and Vice President are chosen. U.S. Const., Art. II, § 1, cl. 2; Amend. XII. This court held in Igartua I that the citizens resident in Puerto Rico do not have a right to vote in presidential elections because Puerto Rico "is not entitled under Article II to choose electors for the President." Igartua I, 32 F.3d at 9-10.

There are two exceptions to the rule that earlier decisions are binding. First, an earlier panel decision "may be undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court." Williams, 45 F.3d at 592. The second exception is for "those relatively rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless

---

constitutional cases, stare decisis carries such persuasive force that [even the Supreme Court has] always required a departure from precedent to be supported by some 'special justification.'" Dickerson v. United States, 120 S. Ct. 2326, 2336 (2000).

offers a sound reason for believing that the former panel, in light of fresh development, would change its collective mind." Id. The Commonwealth argues that those exceptions are met here in light of two Supreme Court decisions: Rice v. Cayetano, 120 S. Ct. 1044 (Feb. 23, 2000), and U.S. Term Limits v. Thornton, 514 U.S. 770 (1995). Neither case support the Commonwealth's argument.

The Court in Rice struck down a Hawaii statute that imposed race-based voting qualifications based on the Fifteenth Amendment's mandate that neither the National Government nor the states may deny or abridge the right to vote on account of race. See Rice, 120 S. Ct. at 1056-57. This Fifteenth Amendment ruling on racial voting classifications does not impact the reasoning in Igartua I that Article II governs the right to vote in presidential elections. The reliance on the Court's holding in U.S. Term Limits similarly is inapt. The Court ruled that States lack the power to impose qualifications for offices of the United States Congress in addition to those set forth in the Constitution. See 514 U.S. at 818-20. The Court's language describing the "fundamental principle of our representative democracy," which appellees cite in their brief, serves to amplify the Court's holding that the states cannot impose restrictions on federal elections, but also does not alter the Article II analysis in Igartua I. Thus, neither case stands for the proposition that the right to vote in the presidential election is derived from any source other than Article II of the Constitution.

Because Igartua I is binding authority, the district court erred in not dismissing the action.

The judgment and order of the District Court is **reversed and vacated** and the case is **remanded** with instructions that the action be dismissed with prejudice.

Concurrence follows.

**TORRUELLA, Circuit Judge (Concurring).** As I did in Igartúa I, I join the Court's opinion in this appeal because I believe it to be technically and, as the law now stands, legally correct in its conclusion that the Constitution does not guarantee United States citizens residing in Puerto Rico the right to vote in the national Presidential election. I also agree with the Court's indication that today's decision expresses no opinion with regard to the validity under Puerto Rico law of Law 403 of September 10, 2000, which is the subject of separate litigation and which I conclude is not properly before us. I am, however, compelled to write separately because I can no longer remain silent to the subjacent question, because from my perspective, there are larger issues at stake.

## I.

More than 100 years ago, at the conclusion of the Spanish-American War of 1898, Puerto Rico was ceded to the United States by Spain.[2] Despite lofty rhetoric at the time extolling the virtues of American democracy,[3] the United States has since exercised almost

---

[2]    See Treaty of Paris, Dec. 10, 1898, United States-Spain, 30 Stat. 1754. Article IX of the treaty reads: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress."

[3]    For example, on July 28, 1898, three days after the landing of American troops at Guánica, General Nelson A. Miles, who commanded the expeditionary force, proclaimed:

> In the prosecution of war against the kingdom of Spain
> by the people of the United States, in the cause of liberty,

-11-

unfettered power over Puerto Rico and the nearly 4,000,000 United

States citizens who currently reside there.[4] Although persons born in

Puerto Rico are citizens of the United States at birth,[5] and thereby

---

> justice and humanity, its military forces have come to
> occupy the island of Porto Rico.  They come bearing the
> banner of freedom, inspired by noble purposes, . . . .
>
> They bring you the fostering arms of a free people,
> whose greatest power is justice and humanity to all living
> within their fold. . . .
>
> They have come not to make war on the people of the
> country, who for centuries have been oppressed; but, on the
> contrary, to bring protection, not only to yourselves, but
> to your property, promote your prosperity and bestow the
> immunities and blessings of our enlightenment and liberal
> institutions and government . . . .

Annual Report of the Major General Commanding the Army, Nelson A.
Miles, Nov. 5, 1898, Messages, 1898-1899, at 31-32.

It should be noted that, at the time of General Miles' arrival,
and since the enactment of the Spanish Constitution of 1812, Puerto
Ricans enjoyed Spanish citizenship and voting representation in the
Spanish Parliament, rights which were confirmed in the Constitution of
1876 and in the Autonomic Charter of 1897.  See 1 José Trías Monge,
Historia Constitucional de Puerto Rico 34-35 (1983).

[4]    See U.S. Census Bureau, Population Div., PR-99-1 Estimates
of the Population of Puerto Rico Municipios, July 1, 1999, (July 21,
2000) <http://www.census.gov/population/www/estimates/puerto
-rico.html>.  This is a larger population than 26 of the States and
more than the combined population of Maine, New Hampshire, and Rhode
Island, which together with Massachusetts and Puerto Rico constitute
the First Circuit.  See U.S. Census Bureau, Population Div., ST-99-3
State Population Estimates: Annual Time Series, (December 29, 1999)
<http://www.census.gov/population/estimates/
state/st-99-3.txt>.

[5]    8 U.S.C. § 1402 (1999) (governing the citizenship of
persons born in Puerto Rico on or after April 11, 1899).  The residents
of Puerto Rico were first granted citizenship in 1917.  See Jones Act

"owe[] allegiance to the United States," <u>Kawakita</u> v. <u>United States</u>, 343 U.S. 717, 736 (1952), while residing in Puerto Rico they enjoy fewer rights than citizens of the United States that reside in the fifty States, <u>see</u> <u>United States</u> v. <u>Verdugo-Urquídez</u>, 494 U.S. 259, 268 (1990) (and cases cited therein), or even in foreign countries, <u>see</u> <u>Reid</u> v. <u>Covert</u>, 354 U.S. 1 (1957). Undoubtedly the most glaring evidence of this egregious disparity is the fact that they do not elect a single voting representative[6] to a federal government that exercises almost absolute power over them.

This anomalous situation arises primarily as a result of the decisions of the Supreme Court in the <u>Insular Cases</u>,[7] which established as early as 1901 the plenary power of Congress over Puerto Rico under the so-called "territorial" clause of the Constitution.[8] In a series of narrowly divided decisions, the Court held that Puerto Rico was an

_____

(Puerto Rico), § 5, ch. 145, 39 Stat. 951 (1917).

[6] The residents of Puerto Rico do elect a Resident Commissioner to represent their interests before Congress, but that official's lack of a vote obviously diminishes his ability to effectively represent them.

[7] <u>Balzac</u> v. <u>Porto Rico</u>, 258 U.S. 298 (1922); <u>Ocampo</u> v. <u>United States</u>, 234 U.S. 91 (1914); <u>Dorr</u> v. <u>United States</u>, 195 U.S. 138 (1904); <u>Hawaii</u> v. <u>Mankichi</u>, 190 U.S. 197 (1903); <u>Downes</u> v. <u>Bidwell</u>, 182 U.S. 244 (1901); <u>Dooley</u> v. <u>United States</u>, 182 U.S. 222 (1901); <u>DeLima</u> v. <u>Bidwell</u>, 182 U.S. 1 (1901).

[8] Article 4, section 3, clause 2, of the Constitution states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."

"unincorporated territory," see Insular Cases, supra note 6, and as a result part of the United States for some purposes[9] and not for others.[10] As such, Congress was held to have plenary power over the internal and external affairs of the Island, subject not even to the Bill of Rights except insofar as those guarantees might be explicitly extended to the Island by Congress. See Downes, 182 U.S. at 286.

Between 1898 and 1917, persons residing in Puerto Rico were considered to be citizens of Puerto Rico[11] and "nationals" of the United States.[12] This condition was changed in 1917, however, when Congress granted United States citizenship en masse to the residents of Puerto Rico.[13] Notwithstanding this apparent upgrading of the personal status

_____

[9]    See, e.g., De Lima, 182 U.S. 1, 200 (1901) (Puerto Rico part of the United States for customs purposes).

[10]    See, e.g., Downes, 182 U.S. 244, 287 (1901) ("[T]he Island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States" for revenue purposes).

[11]    See Foraker Act, § 7, 31 Stat. 77 (1900) (codified as amended at 48 U.S.C. § 733 (1987)).

[12]    The term "national of the United States" is defined at 8 U.S.C. § 1101(a)(22) to mean "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." The only persons currently holding such status are residents of American Samoa and Swains Island.

[13]    See Jones Act (Puerto Rico), § 5, ch. 145, 39 Stat. 951 (1917). This status was reiterated in the Nationality Act of 1940, § 202, ch. 876, 54 Stat. 1139 (1940), in which Congress explicitly stated that all persons born in Puerto Rico automatically became citizens of the United States, a situation analogous to that existing within the then contiguous States under the Fourteenth Amendment. That provision

-14-

of Puerto Rico's residents, the Supreme Court in 1922 in Balzac v.

Porto Rico, 258 U.S. 298 (1922), established the inferior nature of the

United States citizenship held by residents of Puerto Rico by

concluding that the Constitution's protection of these new citizens was

limited to those rights deemed by the Court to be "fundamental."[14] Cf.

Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) (voting is "a fundamental

political right, because [it is] preservative of all rights"); see also

_____

was repealed by the Immigration and Nationality Act of June 27, 1952,
§403, ch. 477, 66 Stat. 280, and replaced by the provision now codified
at 8 U.S.C. § 1402 (1999) (governing the citizenship of all persons
born in Puerto Rico on or after April 11, 1899).

[14]     Balzac involved a claim to trial by jury in a criminal
prosecution, which the Court concluded was unavailable in Puerto Rico
because trial by jury was not a "fundamental" right.  Balzac, 258 U.S.
at 312-13; cf. Duncan v. Louisiana, 391 U.S. 145, 149 (1968) (holding
that "trial by jury in criminal cases is fundamental to the American
scheme of justice").  Balzac has never been reversed and has been cited
approvingly by the Court as recently as 1990.  See United States v.
Verdugo-Urquídez, 494 U.S. 259, 268 (1990). In comparison, in Reid v.
Covert, 354 U.S. 1 (1957), the Court refused to extend the reasoning of
the Insular Cases to American civilians abroad who had been convicted
by a court martial for a felony offense without being afforded the
right to a jury trial.  Justice Black, writing for a four-Justice
plurality (no opinion of any Justices garnered a majority, and only
eight Justices participated in the case), stated: "[I]n view of our
heritage and the history of the adoption of the Constitution and the
Bill of Rights, it seems peculiarly anomalous to say that trial before
a civilian judge and by an independent jury picked from the common
citizenry is not a fundamental right."  Justice Black went further,
rejecting Balzac and the other Insular Cases as outdated, see id. at
14, but concurring Justices Frankfurter and Harlan refused to go so
far, see id. at 54, 66.  Ironically, because the holding of the Court
extends the protection of United States citizenship to a proceeding
that took place in England qua the condition of United States
citizenship, this case seems to stand for the proposition that certain
constitutional rights are inherent in United States citizenship.

-15-

Reynolds v. Sims, 377 U.S. 533, 562 (1964).

## II.

Since Balzac the civil rights of United States citizens residing in Puerto Rico, particularly their national political rights, have remained dormant at best, subject to the vagaries of Congress, and the conspicuous inattention of the judiciary. The granting of so-called "Commonwealth" status in 1952,[15] itself an enigmatic condition[16]

_____

[15] See Public Law 600, ch. 446, 64 Stat. 319 (1950) (codified at 48 U.S.C. § 731(b) (1994)).

[16] Even the term "Commonwealth," as applied to Puerto Rico, is meaningless. Massachusetts, Pennsylvania, and Virginia are all entitled "commonwealths," yet Puerto Rico is certainly not equivalent to them as a political entity. Puerto Rico and the United States certainly do not form a "Commonwealth of Nations" nor is their relationship in anyway similar to that of the nations forming the "British Commonwealth." In fact, the official title of "Commonwealth of Puerto Rico" is also officially in Spanish "Estado Libre Asociado," which literally translated means "Free Associated State." Puerto Rico is neither free nor a state, and as to being "associated" with the United States, the Supreme Court ruled long ago that "the Island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States" for some purposes. Downes, 182 U.S. at 287 (Puerto Rico not part of the U.S. for revenue purposes). But see De Lima, 182 U.S. at 199-200 (Puerto Rico part of the U.S. for tariff purposes) (stating, ironically, "We are unable to acquiesce in this assumption that a territory may be at the same time both foreign and domestic"). The confusion does not end with the name, as the various courts, including of course the Supreme Court and our own, have contributed much to this condition. See Rodríguez v. Popular Democratic Party, 457 U.S. 1 (1982); Harris v. Rosario, 446 U.S. 651 (1980); Califano v. Torres, 435 U.S. 1 (1978); Examining Bd. of Eng'rs v. Flores, 426 U.S. 572 (1976); Calero Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663 (1974); Mercado v. Puerto Rico, 214 F.3d 34, 40, 44 (1st Cir. 2000); Dávila-Pérez v. Lockheed Martin Corp., 202 F.3d 464 (1st Cir. 2000); Moreno v. United States, 38 F.3d 1204 (Fed. Cir. 1994); United States v. Sánchez, 992 F.2d 1143 (11th Cir. 1993); Trailer Marine Trans. Corp. v. Rivera-Vázquez, 977 F.2d 1, 7 (1st Cir.

-16-

which merely allowed the residents of Puerto Rico limited self-government, did nothing to correct Puerto Rico's fundamental condition of national unempowerment, embodied most notably in the lack of voting representation in the Congress and the ineligibility to vote for President and Vice-President. The United States citizens residing in Puerto Rico to this day continue to have no real say in the choice of those who, from afar, really govern them, nor as to the enactment, application, and administration of the myriad of federal laws and regulations that control almost every aspect of their daily affairs.

On numerous occasions since 1952 Congress has turned a blind eye and a deaf ear to the continuing inequality to which United States citizens in Puerto Rico are subjected, and a perusal of the Congressional Record demonstrates the jealousy with which Congress has guarded its plenary power over the Island.[17] The courts have supported this view. See Harris v. Rosario, 446 U.S. 651 (1980); Califano v. Torres, 389 U.S. 1 (1978).

This is not a totally unpredicted scenario. As far back as 1901, in the first of the Insular Cases, De Lima v. Bidwell, 182 U.S.

1992); United States v. López-Andino, 831 F.2d 1164 (1st Cir. 1987); Córdova v. Simonpietri Ins. Agency v. Chase Manhattan Bank, 649 F.2d 36 (1st Cir. 1981).

[17] See Hearings Before the House Comm. on Resources on H.R. 4751, 106th Cong., (Oct. 4, 2000); Young Bill, H.R. 856, 105th Cong. (1997); Fernós-Murray Bill, H.R. 5926, 86th Cong. (1959); Aspinall Bill, H.R. 5945, 88th Cong. (1963); Hearings Before House Subcomm. on Territorial Affairs on H.R. 5945, 88th Cong. (1963).

at 196-97, the Court expressed its concern with the possibility that Congress might hold Puerto Rico in limbo indefinitely:

> The theory that a country remains foreign with respect to the tariff laws until Congress has acted by embracing it within the Customs union, . . . presupposes that territory may be held indefinitely by the United States; that it may be treated in every particular, except for tariff purposes, as domestic territory; that laws may be enacted and enforced by officers of the United States sent there for that purpose; that insurrections may be suppressed, wars carried on, revenues collected, taxes imposed; in short, that everything may be done which a government can do within its own boundaries, and yet that the territory may still remain a foreign country. That this state of things may continue for years, for a century even, but that until Congress enacts otherwise, it still remains a foreign country. To hold that this can be done as matter of law we deem to be pure judicial legislation. We find no warrant for it in the Constitution or in the powers conferred upon this court . . . . (Emphasis provided).

See also Downes, 182 U.S. at 379-80 (Harlan, J. dissenting).

The present conundrum cannot be justified or perpetuated further under the subterfuge of labeling it a "political question." Undoubtedly, this situation is "political" in the sense that it involves the political rights of a substantial number of United States citizens. It is also "political" because it is one that should, in the normal course of things, be resolved by the political process and the political branches of government. But in the final analysis, this problem is no more "political" than that presented to and resolved by

-18-

the Supreme Court in Brown v. Board of Education, 347 U.S. 483 (1954), one that required corrective judicial action even in the face of longstanding legal precedent.[18]  In Brown, the Court recognized that, as the ultimate interpreter and protector of the Constitution, it must at times fill the vacuum created by the failure or refusal of the political branches to protect the civil rights of a distinct and politically powerless group of United States citizens.  See also United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938) (famously suggesting that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and . . . may call for a correspondingly more searching judicial inquiry").

The United States citizens residing in Puerto Rico are caught in an untenable Catch-22.  The national disenfranchisement of these citizens ensures that they will never be able, through the political processes, to rectify the denial of their civil rights in those very political processes.  This uninterrupted condition clearly provides solid basis for judicial intervention at some point, one for which there is resounding precedent.  See Brown v. Board of Education, supra.

## III.

In this 211th year of the United States Constitution, and

---

[18]    See Plessy v. Ferguson, 163 U.S. 537 (1896).

102nd year of United States presence in Puerto Rico, United States citizenship must mean more than merely the freedom to travel to and from the United States. See Balzac, 258 U.S. at 308. This citizenship should not, cannot, be devalued to such a low scale.

After more than a century of United States possession of Puerto Rico, there continues to be tremendous debate over the status of the Island and the nature of its relationship with the United States. Certainly the citizens of Puerto Rico are divided on the issue, a condition which has permitted the federal government to externalize this question. What is established, for the time being at least, is that the federal courts continue to recognize the almost absolute power of Congress to unilaterally dictate the affairs of Puerto Rico and her people. So long as that is the case, the practicality of the matter is that Puerto Rico remains a colony with little prospect of exerting effective political pressure on the elected branches of government to take corrective action.

The contemporary society of United States citizens residing in Puerto Rico hardly deserves colonial treatment by the United States, assuming that such treatment is ever justified. Puerto Rico is home to a vibrant intellectual and cultural community which includes many institutions of higher education and other indicia of modern society, as well as a solid economic foundation which is wholly integrated into the National framework. Most importantly, its citizens have

-20-

contributed in full measure, and at times beyond, to the defense of our Country.[19]

The perpetuation of this colonial condition runs against the very principles upon which this Nation was founded. Indefinite colonial rule by the United States is not something that was contemplated by the Founding Fathers nor authorized per secula seculorum by the Constitution. See Downes, 182 U.S. at 380 (Harlan, J., dissenting) ("The idea that this country may acquire territories anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces,--the people inhabiting them to enjoy only those rights as Congress chooses to accord to them,--is wholly inconsistent with the spirit and genius, as well as with the words, of the Constitution."). And far from being a matter of local concern to the United States citizens in Puerto Rico only, the inequality to which these citizens are subjected is an injury to every American, because as surely as the current situation causes irreparable harm to United States citizens residing in Puerto Rico, it just as powerfully

_____

[19]   For example, more than 62,000 Puerto Ricans served in World War II. In Korea, over 43,000 Puerto Ricans served, including almost 40,000 volunteers, and approximately 3,540 of them lost their lives in defense of the United States, the second highest rate per capita of any jurisdiction in the Nation. Some 48,000 Puerto Ricans served in Vietnam; approximately 270 were killed and more than 3,000 wounded. Puerto Ricans also served in World War I and in every significant United States conflict since Vietnam, including the Persian Gulf War. See Lance Oliver, Puerto Rico's Overlooked Veterans, P. R. Herald (Nov. 11, 1999), available online at <http://www.puertorico-herald.org>.

denigrates the entire Nation and the Constitution.

Although this is not the case, nor perhaps the time, for a federal court to take remedial action to correct what is a patently intolerable situation, it _is_ time to serve notice upon the political branches of government that it is incumbent upon them, in the first instance, to take appropriate steps to correct what amounts to an outrageous disregard for the rights of a substantial segment of its citizenry.  A failure to do so countenances corrective judicial action. See Brown v. Board of Education, supra.  It may be that the federal courts will be required to take extraordinary measures as necessary to protect discrete groups "completely under the sovereignty and dominion of the United States."  Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831) (Marshall, C.J.).

My concurrence in today's decision, of course, indicates that I do not consider this the appropriate case for such intervention, largely because the particular issue of the presidential vote is governed by explicit language in the Constitution providing for the election of the President and Vice-President by the States, rather than by individual citizens.  But I, for one, am of the view that my vote today is not equivalent to a carte blanche.