Igartua de la ROSA, et al., Plaintiffs,

v.

**UNITED STATES of America,
et al., Defendants.**

Civ. No. 91–2506(RLA).

United States District Court,
D. Puerto Rico.

Jan. 20, 1994.

Gregorio Igartúa de la Rosa, Aguadilla, PR, for plaintiffs.

Silvia Carreño Col, Asst. U.S. Atty., U.S. Attorney's Office, Hato Rey, PR, Michael J. Haungs, U.S. Dept. of Justice, Washington, DC, for defendants.

## OPINION AND ORDER

ACOSTA, District Judge.

This is an action filed by residents of Puerto Rico who wish to vote for the President and the Vice President of the United States. Some of the plaintiffs have always resided in Puerto Rico and have never participated in presidential elections. Others had exercised their right to vote while residing in a state of the union but have become ineligible because of their change of residence to the Commonwealth of Puerto Rico. The complaint alleges that the inability to vote in the presidential elections violates their constitutional rights and seeks declaratory and injunctive relief against the United States.

The Court has before it defendants' Motion for Judgment on the Pleadings (docket No. 12)[1] alleging, in essence, that the complaint does not state a claim upon which relief can be granted, and also that the complaint impermissibly seeks an advisory opinion from this Court regarding the constitutionality of legislation which has not been enacted. Plaintiffs have filed their Opposition (docket No. 16), and a Supplementary Motion thereto (docket No. 24).

Upon careful consideration of the arguments advanced by the parties, this Court finds that this action should be dismissed for failure to state a claim upon which relief can be granted.

### RELEVANT CONSTITUTIONAL PROVISIONS

Article II of the Constitution of the United States provides that "[e]ach **state** shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors …" U.S. Const. Art. II § 1 (our emphasis). The Electors appointed by the states, and not the voting public, are the ones who vote for, and elect, the President and Vice President of the United States. *Id.* The Constitution further provides that only states and, through the Twenty–Third Amendment, the District of Columbia, may cast electoral votes in presidential elections. U.S. Const. Art. II, § 1; amend. XXIII.

In 1974, this District Court faced a similar constitutional challenge to that now presented by plaintiffs; the same was rejected as plainly without merit. *Sánchez v. United States,* 376 F.Supp. 239, 241 (D.P.R.1974). This Court held:

Although plaintiff is a U.S. citizen, under the Constitution of the United States the President is not chosen directly by the citizens, but by the electoral colleges in the States and the District of Columbia … The whole thrust of this is that the Constitution does not by its terms, grant *citizens* the right to vote, but leaves the matter entirely to the *States.*
*Id.*

---

1. *See also,* Reply Brief in Support of Defendants' Motion for Judgment on the Pleadings, docket No. 31.

A more recent challenge by residents of Guam was, likewise, rejected. "The right to vote in presidential elections under Article II inheres not in citizens but in states." *Attorney General of the Territory of Guam v. United States,* 738 F.2d 1017, 1019 (9th Cir. 1984), *cert. denied,* 469 U.S. 1209, 105 S.Ct. 1174, 84 L.Ed.2d 323 (1985). The Ninth Circuit concluded that the Constitution "does not grant to American citizens the right to elect the President." *Id.* "Since Guam concededly is not a state, it can have no electors, and plaintiffs cannot exercise individual votes in a presidential election. There is no constitutional violation." *Id.*

■ Therefore, granting U.S. citizens residing in Puerto Rico the right to vote in presidential elections would require either that Puerto Rico become a state, or that a constitutional amendment, similar to the Twenty–Third Amendment, be adopted. *Territory of Guam,* 738 F.2d at 1019; *Sánchez v. United States,* 376 F.Supp. at 242. As of this date, Puerto Rico has not become a state, neither has a constitutional amendment been adopted granting Puerto Rico the right to vote in presidential elections, as was specifically accorded to the District of Columbia.

### THE POLITICAL QUESTION DOCTRINE

■ In order to circumvent the constitutional provisions cited above, plaintiffs contend that "Puerto Rico['s] present political status has evolved in such a way from a Territory in 1898 to that of a 'de facto' state," and that consequently, it should be considered a state entitled to electoral votes. *See* Opposition at 2. This argument, as defendant points out, presents a political question not suitable for judicial resolution.

■ The political question doctrine, which is an aspect of the Court's Article III jurisdiction, is premised upon the separation of powers among the three coordinate branches of government and the inherent limits of judicial power. *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948);

*United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1379 (D.C.Cir.1981), *cert. denied,* 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982).

In *Baker v. Carr,* the Supreme Court identified six "formulations" that signal the presence of issues which are committed to the political branches:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710.

■ "Implicating any one of these factors renders a question 'political' and thus nonjusticiable." *United States v. Mandel,* 914 F.2d 1215, 1222 (9th Cir.1990). A nonjusticiable case must be dismissed as not presenting a "case" or "controversy" under Article III of the Constitution. *See* 369 U.S. at 198, 217, 82 S.Ct. at 710. Article III courts have a limited scope of jurisdiction, and will only decide upon matters that constitute a case or controversy. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).

A complaint must set forth an actual case and controversy for judicial review. By seeking to obtain electoral votes for Puerto Rico as if it were a state, plaintiffs are requesting that this Court disregard the balance between the three coordinate branches of government, and the Article III courts' inherent limits of judicial power. *Baker v. Carr,* 369 U.S. at 210, 82 S.Ct. at 706.

A determination on whether or not Puerto Rico's political status has evolved into "de

facto" statehood for purposes of presidential elections would correspond to Congress. The text of the Constitution specifically commits the decision to create new states to Congress: "New States may be admitted *by the Congress* into this Union." U.S. Const. Art. IV, § 3 (our emphasis). In seeking to have Puerto Rico recognized as a "de facto state," plaintiffs seek to thrust the Court into a decision the Constitution specifically entrusts to the legislative branch of government.

Moreover, no standards exist by which a Court can or should decide what is or is not a "de facto" state. Whether Puerto Rico should be considered a "de facto" state for purposes of presidential elections is a question characterized by "a lack of judicially discoverable and manageable standards" for its resolution. *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710.

Any attempt by this Court to determine whether Puerto Rico has sufficient attributes of statehood so as to be a state for purposes of Article II, § 1 would involve "an initial policy determination of a kind clearly for nonjudicial discretion." *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710. Since the question of the political status of Puerto Rico has been the subject of debate both on the Island and in Congress, it is up to the legislative branch to make the initial policy determination regarding this matter.

Consequently, and pursuant to the political question doctrine, this Court will not enter into a matter that clearly pertains to Congress. Article III courts have historically avoided altering the balance between the three branches of government. *See Warth v. Seldin*, 422 U.S. at 498, 95 S.Ct. at 2204. If plaintiffs wish to obtain a determination on whether or not Puerto Rico has become a "de facto" state for the purpose of presidential elections, they should address their views and concerns to the Congress of the United States, and not to this Court.

*ABSENTEE VOTING*

Plaintiffs' second argument for the proposition that residents of Puerto Rico should be afforded the right to vote in presidential elections pertains to absentee balloting. In the complaint, nine of the twelve plaintiffs allege that although they previously qualified to vote in presidential elections by virtue of their residence in various states, they have lost this right upon relocating to Puerto Rico.

Plaintiffs also contend that "[f]ederal election qualification of absentee voters are clearly and unquestionably promulgated by Congress, not states," and that federal law alone determines who may vote by absentee ballot in federal elections. *See* Opposition at 14. Plaintiffs further argue that the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. §§ 1973ff to ff–6 ("the Act") is unconstitutional, as it allows absentee voting by overseas citizens, but not by state residents who have relocated in Puerto Rico.

■ While federal law places some limits on the ability of states to regulate federal elections,[2] it is primarily the states, not the federal government, that determine the manner in which presidential electors are chosen. *Anderson v. Celebrezze*, 460 U.S. 780, 794 n. 18, 103 S.Ct. 1564, 1573 n. 18, 75 L.Ed.2d 547 (1983); *Sánchez*, 376 F.Supp. at 241.

The Act, 42 U.S.C. §§ 1973ff to ff–6, grants U.S. citizens living abroad the right to vote in federal elections, as though they were present in their last place of residence in the United States. The Act specifically applies to residents of the fifty states—and to residents of Puerto Rico, Guam, the Virgin Islands and American Samoa—who live overseas. 42 U.S.C. §§ 1973ff–1, ff–6(6).

The Act does not establish the sole criteria for absentee voting, but rather leaves states free to allow additional classes of people to vote by absentee ballot. Similarly, the Act recognizes that states may impose additional requirements on absentee voters as long as these are not inconsistent with federal law.

---

**2.** For instance, the Voting Rights Amendments of 1970, 42 U.S.C. § 1973aa–1 (1988), limits the ability of states to impose durational residency requirements on individual voting in presidential

elections, yet leaves other matters to the discretion of the states. *See Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

The Act does not prevent persons who have become qualified to vote in a particular state from continuing to vote in that state by absentee ballot during a period of residence elsewhere in the United States.

As defendant properly brings to our attention, plaintiffs have not cited any provision of federal law which prohibits them from voting by absentee ballot. Furthermore, plaintiffs have apparently not contacted the states where they resided prior to relocating to Puerto Rico to inquire about the absentee ballot provisions at those states. Were they to be denied the right to vote, they could seek relief from those states. It would be up to the states in question to determine whether plaintiffs are qualified voters for the purpose of absentee balloting.

■ Therefore, and contrary to plaintiffs' assertions, neither the Voting Rights Amendments nor the Uniformed and Overseas Citizens Absentee Voting Act impair the ability of plaintiffs to continue voting for President and Vice President. The issue of whether they are qualified voters would be one to be determined by the states where they previously resided. As this would not be a matter under federal law, plaintiffs' contention fails to state a claim against the United States upon which relief can be granted.

### DUE PROCESS AND EQUAL PROTECTION CLAUSES

As part of the absentee voting issue, plaintiffs also allege that the Uniformed and Overseas Citizens Absentee Voting Act is unconstitutional, since it violates the Due Process Clause and the Equal Protection component of the Fifth Amendment. Plaintiffs argue that the Act discriminates against U.S. citizens by denying those who previously voted in presidential elections the right to absentee voting. *See* Opposition at 25.

■ This Court must only entertain unavoidable constitutional questions. *Commonwealth v. Secretary of Health and Human Services,* 899 F.2d 53, 55 (1st Cir.1990). If there are suitable alternative grounds, courts have the duty to avoid the constitutional issues. *Benoni v. Boston and Maine Corp.,* 828 F.2d 52 (1st Cir.1987). Although

we have found that the complaint fails to bring a proper case and controversy before the Court, we will, nonetheless, briefly address plaintiffs' constitutional challenge.

■ Under the Due Process Clause, if a statute has a "reasonable relation to a proper legislative purpose, and [is] neither arbitrary nor discriminatory, the requirements of due process are satisfied...." *Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934). Likewise, under the Equal Protection Clause, a statute not directed at a suspect or quasi-suspect class must be upheld if it has a rational basis. *Clements v. Fashing,* 457 U.S. 957, 967, 102 S.Ct. 2836, 2845, 73 L.Ed.2d 508 (1982) (citing *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)); *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 177, 179, 101 S.Ct. 453, 460, 461, 66 L.Ed.2d 368 (1980); *Mathews v. De Castro,* 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976). Since the distinction drawn in the Act, between U.S. citizens living abroad and U.S. citizens living within the United States, does not implicate any suspect or semi-suspect class of people, it is evaluated under the "rational basis" test for Equal Protection purposes.

The Act has a legitimate governmental purpose, namely "to facilitate absentee voting by United States citizens, both military and civilian, who are overseas." H.R.Rep. No. 99–765, 1986 U.S.C.C.A.N. at 2009. It should be emphasized that the Act does not grant all overseas state residents the right to vote in presidential elections. Instead, it grants U.S. citizens living abroad the right to vote in federal elections—whether for president or other federal offices—as though they were present in their last place of residence in the United States.

That the Act is limited to American citizens who are absent from the country, rather than Americans who move from place to place within the United States, is rational and nondiscriminatory. Americans who move within the United States lose their voting rights in their old residence while gaining voting rights in their new residence, whereas Americans who move overseas do

**612**

not acquire new voting rights in the country to which they move. The Act simply ensures that such overseas citizens can continue voting in federal elections from their last place of residence as though they were still there.

When a resident of New York moves abroad, he or she will not gain voting rights at the new country. The Act would allow such a voter to retain his or her New York voting rights. If this same resident of New York relocated to Puerto Rico, he or she would no longer participate in New York federal elections, but would gain voting rights in Puerto Rico—and vote in federal elections for the Resident Commissioner. Although plaintiffs consider this change of voting rights as highly unfavorable, *see* Opposition at 12–13, this Court finds that such changes in voting rights are part of the benefits and burdens of moving to another jurisdiction.

Therefore, the Act has a reasonable relation to a proper legislative purpose, is neither arbitrary nor discriminatory, and has a rational basis. The Act is not unconstitutional, and plaintiffs have failed to state a claim on which relief can be granted.

In view of the above, and after careful consideration of the arguments advanced by the parties in their pleadings and motions, the Court hereby **GRANTS** Defendant's Motion for Judgment on the Pleadings, and consequently, hereby **DISMISSES** the instant action with prejudice, for failure to state a claim upon which relief can be granted.

IT IS SO ORDERED.