Gregorio **IGARTUA DE LA ROSA**, et al., Plaintiffs,

v.

**UNITED STATES of America**, **Defendant**.

No. CIV.03–1946(RLA).

United States District Court, D. Puerto Rico.

Aug. 19, 2004.

Igartúa De la Rosa, Aguadilla, PR, for Plaintiffs.

Isabel Muñoz–Acosta, U.S. Attorney's Office, Torre Chardón, San Juan, PR, PHV Jean Michel Voltaire, U.S. Department of Justice, Washington, DC, for Defendant.

### ORDER DISMISSING THE COMPLAINT

ACOSTA, District Judge.

This is the third action spearheaded by plaintiff GREGORIO IGARTUA DE LA ROSA within the past decade seeking to enfranchise U.S. citizens residents of Puerto Rico with the right to vote for the U.S. President and Vice President.[1] Plaintiffs consist of lifetime residents of Puerto Rico and individuals previously qualified to vote in the presidential elections by virtue of their residency in a state but lost that right upon moving to Puerto Rico. Plaintiffs claim that their inability to vote in presidential elections violates their constitutional rights and also runs contrary to international obligations of the United States. Additionally, the complaint challenges the constitutionality of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C §§ 1973ff to 1973ff–6.

Defendant has moved the court for dismissal of the complaint *inter alios* on *stare decisis* grounds.

### PROCEDURAL BACKGROUND

■ The Presidential vote issue was first addressed in our Circuit in *Igartua I*. The Court of Appeals' ruling in the *Igartua I* case was straightforward. "[T]he Constitution does not grant citizens the right to vote directly for the President." 32 F.3d at 9. The President is selected instead by electors who are chosen by a mechanism devised by each State legislature. Thus, pursuant to the U.S. Constitution " '[t]he right to vote in presidential elections under Article II inheres not in citizens but in states' ". *Id.* at 10 (citing *Attorney Gen. of Guam on Behalf of All U.S. Citizens Residing in Guam, etc. v. United States,* 738 F.2d 1017, 1019 (9th Cir.1984)) *cert. den.* 469 U.S. 1209, 105 S.Ct. 1174, 84 L.Ed.2d 323 (1985).

The court further noted that the only non-state jurisdiction granted the authority to participate in the presidential elections is the District of Columbia which gained the right by an amendment to the Constitution. Because Puerto Rico is not a state, enfranchisement is not viable absent a change in political status or a constitutional amendment to that effect. *Igartua I,* 32 F.3d at 10.

Plaintiffs' argument that the International Covenant of Civil and Political Rights ("ICCPR") served as a basis for the right to vote for the president was also rejected by the court. *Id.* n. 1.

Lastly, the court specifically ruled against plaintiffs' argument that the provisions of the UOCAVA precluding U.S. citizens moving to Puerto Rico—as opposed

---

**1.** *See Gregorio Igartua de la Rosa v. United States,* 32 F.3d 8 (1st Cir.1994), *cert. den.* 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995) (*"Igartua I "*), and *Igartua de la Rosa v. United States,* 229 F.3d 80 (1st Cir.2000) (*"Igartua II "*).

to outside the United States—from voting in their prior state of residence were unconstitutional.

In *Igartua II* the court of appeals reversed the lower court's finding that U.S. citizens residing in Puerto Rico had the right to vote in the presidential elections. The reversal was premised on *stare decisis* principles. According to the opinion, "[b]ecause *Igartua I* is binding authority, the district court erred in not dismissing the action." *Igartua II*, 229 F.3d at 85.

## STARE DECISIS

In its motion to dismiss defendant points to *Igartua I* and *Igartua II* as valid *stare decisis* precedent justifying dismissal of this suit. Plaintiffs oppose arguing that "new reasons and change in circumstances... justify this Court to grant the relief requested in the complaint, thus the legal basis in the case is different." Opposition (docket No. 5) p. 2.

 *Stare decisis* is an abridged version of the Latin phrase *stare decisis et non quieta movere* which means "[t]o stand by things decided, and not to disturb settled points." Black's Law Dictionary 1414 (7th ed.1999). It relates to the court's practice of following binding precedent. Ordinarily courts will stand committed to follow prior rulings rendered either by that same court or courts to which it owes hierarchical obedience. "[T]he principle of *stare decisis* the doctrine that 'renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision,' is an integral component of our jurisprudence." *Stewart v. Dutra Const. Co.*, 230 F.3d 461, 467 (1st Cir.2000) (citing *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir.1993)); *Arecibo Cmty. Health Care, Inc. v. Commonwealth of Puerto Rico*, 270 F.3d 17, 22 (1st Cir. 2001); *Igartua II*, 229 F.3d at 84. *See also, Carpenters Local Union No. 26 v. United States Fid. & Guar. Co.*, 215 F.3d

136, 141 (1st Cir.2000) ("the principle of *stare decisis* forms an integral part of our system of justice.... that system is not only precedent-based but also hierarchical.")

] Through *stare decisis* the courts ensure "finality, stability, and certainty in the law". *Carpenters Local Union*, 215 F.3d at 142; *Arecibo Cmty. Health Care*, 270 F.3d at 22; *Stewart v. Dutra*, 230 F.3d at 467. "But *stare decisis* is neither a straightjacket nor an immutable rule; it leaves room for courts to balance their respect for precedent against insights gleaned from new developments, and to make informed judgments as to whether earlier decisions retain preclusive force." *Carpenters Local Union*, 215 F.3d at 142.

] Given the significant role it plays in the judicial system, "[a] departure from *stare decisis* must therefore be supported by some 'special justification.' ". *Arecibo Cmty. Health Care*, 270 F.3d at 22 (citing *Dickerson v. United States*, 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). *See also, Stewart v. Dutra*, 230 F.3d at 467 ("a departure from a court's own precedent, in the teeth of the principle of *stare decisis*, must be supported by some 'special justification.' ")

 In *Williams v. Ashland Eng'g Co., Inc.*, 45 F.3d 588, 592 (1st Cir.1995) the First Circuit Court of Appeals identified two situations which would prove adequate for courts to deviate from prior precedent. These are: when *stare decisis* is undermined by "controlling authority, subsequently announced, such as an opinion of the Supreme Court, an en banc opinion of the circuit court, or a statutory overruling... [or in] those relatively rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light

of fresh developments, would change its collective mind." This reasoning has been consistently followed in subsequent appellate opinions. *See, Arecibo Cmty. Health Care,* 270 F.3d at 23; *Stewart v. Dutra,* 230 F.3d at 467; *Igartua II,* 229 F.3d at 84.

■ Plaintiffs passionately argue that recent jurisprudence as well as new legislation and international obligations confirm their arguments that "the basis for the vote in Presidential elections is citizenship"[2] and that the right to vote is a fundamental right which cannot be denied to U.S. citizens.

Plaintiffs cite *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) for the proposition that "the basis for the right to vote in federal elections is American citizenship."[3] This statement, however, has been taken out of context. In that case the *per curiam* Court specifically noted that under the current constitutional framework state legislatures have complete control over the manner in which the members of the electoral college, i.e., those actually voting for the President, will be selected. State legislatures may choose the electors themselves or allow the individual voters to do so. Because the right lies with them legislatures may even switch the selection system at will.

The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college. U.S. Const., Art. II, § 1. This is the source

for the statement in *McPherson v. Blacker,* 146 U.S. 1, 35, 13 S.Ct. 3, 36 L.Ed. 869 (1892), that the state legislature's power to select the manner for appointing electors is plenary; it may if it so choose, select the electors itself, which indeed was the manner used by state legislatures in several States for many years after the framing of our Constitution... History has now favored the voter, in each of the several States the citizens themselves vote for Presidential electors. When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter. The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors.

*Bush v. Gore,* 531 U.S. at 104, 121 S.Ct. 525.

Hence, there is no new jurisprudence warranting departure from prior clear, applicable precedent. Nor is there new legislation cited by plaintiffs in their opposition which would require the court to disregard *Igartua I* and *Igartua II.*[4]

■ Plaintiffs refer to the obligations of the United States under the ICCPR, the U.N. Declaration of Human rights, and the OAS Democratic Charter as additional basis for extending the right to vote to Puerto Rico residents. This argument also fails. In discussing the import of the ICCPR on the right to vote in the presi-

---

2. Opposition (docket No. 5) pp. 2–3.

3. Opposition (docket No. 5) p. 16.

4. Plaintiffs cite The National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg to 1973gg–10, and the Help America Vote Act of 2002, 42 U.S.C. §§ 15301 to 15306 as grounds for their argument that federal legislation establishes citizenship as the basis for voting in federal elections. We find, however, that references in these statutes to the right to vote do not bestow the electoral vote upon the residents of Puerto Rico.

dential election the *Igartua I* court specifically noted that even assuming that it provided for "privately enforceable rights" it could not "override the constitutional limits" imposed by Art. II. *Id.*, 32 F.3d at 10 n. 1. Likewise, rights and duties found in any other international obligations listed by plaintiffs as adopted by the United States—even if we were to assume them to be self-executing—cannot run contrary to an express constitutional mandate. In other words, the Constitution trumps inconsistent provisions.

The constitutionality of the UOCAVA has already been determined in *Igartua I*, 32 F.3d at 10 and we find no reason to revisit this matter.[5]

## THE PUERTO RICAN DILEMMA

The following comments do not constitute a holding of this court. However, because of the nature of this case the writer finds it incumbent to emit a monitory to plaintiff, Gregorio Igartua de la Rosa.[6]

The *Igartua I* and *Igartua II* cases were based on essentially similar claims. Accordingly, the Circuit court of Appeals dismissed *Igartua II* on *stare decisis*. Today this court will dismiss plaintiff's complaint once again on the grounds of *stare decisis*. In all likelihood, this case will be designated *Igartua III*. The purpose of this monitory is not to dampen the ardor of an obvious crusader who, undoubtedly, is sincerely following his quest in addressing a very serious issue which this writer does not take lightly. Indeed, other judges, district and appellate, in this and other circuits have demonstrated concern over the anomaly presented because of the "peculiar structure"[7] of the constitutional dictates relating to the election of the President resulting in U.S. citizens residing in Puerto Rico being unable to vote in a presidential election.[8] This is particularly poignant when one considers the fact that thousands of residents of Puerto Rico serve—and many have died—in the armed forces of the United States on an equal footing with their stateside "compatriots" *sans* the vote for their Commander-in-Chief, the President of the United States.

Equally acidulous are the noble pronouncements written into treaty obligations assumed by the United States such

**5.** A similar constitutional attack on the UOCAVA provisions brought by a former resident of New York who relocated to Puerto Rico was also rejected in *Romeu v. Cohen*, 265 F.3d 118 (2nd Cir.2001).

**6.** MR. IGARTUA DE LA ROSA appears as both lead plaintiff and counsel.

**7.** *Romeu v. Cohen*, 265 F.3d at 128 (Laval, J.)

**8.** "The United States citizens residing in Puerto Rico are caught in an untenable Catch–22. The national disenfranchisement of these citizens ensures that they will never be able, through the political processes, to rectify the denial of their civil rights in those very political processes." *Igartua II*, 229 F.3d at 80 (Torruella, J.).

"Furthermore, there is no question that the residents of Puerto Rico suffer the consequences of 'the inferior nature of the United States citizenship' they hold." *United States v. Santana*, 184 F.Supp.2d 131, 139 (D.P.R. 2001) (Dominguez, J.) (citing *Igartua II*, 229 F.3d at 86).

"[T]here is little doubt that all American citizens living in Puerto Rico are suffering a grave injustice. As American citizens, they should be allowed to vote for their national leader." *Romeu v. Cohen*, 121 F.Supp.2d 264, 285 (S.D.N.Y.2000) (Scheindlin, J.)

"Still, despite paying for their citizenship with blood, U.S. citizens residing in Puerto Rico have not entered the Presidential ballot box. It is inconceivable to our constitutional order to expect that the government can place our nation's sons and daughters in harm's way and not recognize the power of those individuals to have a say in electing those who will make that decision." *Igartua de la Rosa v. United States*, 107 F.Supp.2d 140, 145 (D.P.R.2000) (Pieras, J.)

as the ICCPR [9] which employs the following aspiring language: "Every *citizen* shall have the right... to vote and be elected at genuine periodic elections which shall be by universal and equal suffrage" [10] and "*[a]ll persons* are equal before the law".[11] Obviously, these noble utterances about the rights of *all* citizens before the law sits ill at ease with the notion that there is an exception to that right if one is a resident of Puerto Rico. This state of affairs has even prompted one judge to observe, *ex-curia*, that: "In addition, this exclusion [from the presidential vote] fuels annual attacks on the United States in hearings in the United Nations, at which the United States is descried as hypocritically preaching democracy to the world while practicing nineteenth-century colonialism at home." [12] As previously intimated, the anomaly has not gone unnoticed, neither by this nor other courts. However, as Justice Oliver Wendell Holmes, Jr. so famously said: "The life of the law is not logic, it has been experience." [13] I can only assume that, in this case, "experience" means that in the various plebiscites to date the citizens of Puerto Rico have yet to resolve this anomaly themselves. Contrary to what some may passionately desire, it is not the function of this court to make future plebiscites irrelevant. As this court has previously held, it is a political matter to be resolved in other forums.[14]

To sum up, the court understands and sympathizes with Mr. Igartua de la Rosa's arguments. Nevertheless, the Court of

Appeals' ruling in the *Igartua II* case was unequivocal and unambiguous and this court is bound to it. Subsequent to the Court of Appeals issuing its decision none of the requisite conditions listed by the Court as necessary to extend the vote to Puerto Rico residents have been met. From a judicial point of view we sit in the exact same place the Court of Appeals sat in *Igartua II* and are compelled to make the same remarks it made to counsel.

Since our decision in *Igartua I* in 1994, Puerto Rico has not become a State, nor has the United States amended the Constitution to allow United States citizens residing in Puerto Rico to vote for President... Absent such a change in the status of Puerto Rico or an amendment to the Constitution of the United States, our decision in *Igartua I* controls this case, unless there has been intervening controlling or compelling authority.

*Igartua II*, 229 F.3d at 84.

We find that plaintiffs' arguments—albeit disturbing—do not constitute a "special justification" and are therefore, not legally sufficient to allow us to depart from clear and applicable precedent.

## CONCLUSION

Defendant's Motion to Dismiss (docket No. 3) [15] is **GRANTED** and the complaint filed in this case is hereby **DISMISSED** on *stare decisis* grounds.

9. 6 I.L.M. 368 (1967) (entered into force Sept. 8, 1992).

10. Art. 25 (italics added).

11. Art. 26 (italics added).

12. *Romeu v. Cohen*, 265 F.3d at 127–28 (Laval, J.)

13. "The Common Law" (1981).

14. *Igartua v. United States*, 842 F.Supp. 607 (D.P.R.1994), aff'd *Igartua I. See also, Romeu v. Cohen*, 121 F.Supp.2d 264.

15. *See also*, Plaintiffs' Motion in Opposition (docket No. **5**); Reply Motion (docket No. **7**); Motion Filing Supporting Evidence to the Complaint (docket No. **12**), and Motion Filing Supporting Evidence to the Complaint (docket No. **13**).

Defendant's Statement Concerning Filing of a Reply Brief (docket No. **6**) is **NOTED.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.

### JUDGMENT

The court having dismissed the complaint filed in this case through its Order issued on this date, it is hereby

ORDERED AND ADJUDGED that the complaint filed in this case be and the same is hereby **DISMISSED ON *STARE DECISIS*** grounds.

IT IS SO ORDERED.